UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR, et al.,<br><br>    Defendants. | Case No. 20-cv-02141-LB<br><br>**ORDER GRANTING PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Re: ECF No. 6 |

## INTRODUCTION

The petitioner, a citizen of Haiti and a lawful permanent resident of the United States, is in removal proceedings based on his conviction for second-degree robbery.[1] He finished his state sentence and has been in the custody of the U.S. Immigration and Customs Enforcement ("ICE") at Yuba County Jail since April 15, 2019.[2] He has not had a bond hearing. He has medical issues — chronic post-traumatic stress disorder ("PTSD"), depression, and latent tuberculosis — and given the COVID-19 pandemic and his conditions of confinement at Yuba County Jail, he petitions under 28 U.S.C. § 2241 for his release or, alternatively, a bond hearing within seven days

---

[1] Pet. – ECF No. 1. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Notice of Custody Determination, Ex. C to Pet. – ECF No. 1-2 at 13.

ORDER – No. 20-cv-02141-LB

before an Immigration Judge ("IJ"). He also moved for a temporary restraining order ("TRO") to obtain the same relief.[3] After full briefing and a hearing on April 9, 2020, the court grants the petitioner's motion for a TRO and orders his release.

**STATEMENT[4]**

**1. COVID-19**

The World Health Organization has designated COVID-19 a global pandemic.[5] The state of California has declared a state of emergency, and the President has declared a national emergency.[6] Our courthouses are mostly closed to in-person business, and counties have implemented shelter-in-place orders that require social distancing and the closing of schools and businesses.[7] These are extraordinary times.[8]

---

[3] Pet. – ECF No. 1; Mot. – ECF No. 6.

[4] In part because this is a TRO, the court overrules the government's objections to the evidence submitted with the petitioner's reply brief. Opp'n – ECF No. 16 at 11 n. 5; Objs. – ECF No. 22; *see Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm"). The severity of COVID-19 is undisputed. The information about the petitioner's community support is helpful and cannot be reasonably disputed.

[5] World Health Organization, *WHO Director-General's opening remarks at media briefing* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited April 10, 2020).

[6] Proclamation of State Emergency (Mar. 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf (last visited Apr. 10, 2020); Proclamation No. 994, 85 F3d. Reg. 15,337), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Apr. 10, 2020).

[7] *See United States v. Daniels*, No. 19-cr-00709-LHK (NC), Order – ECF No. 24 at 3–4 (N.D. Cal. Apr. 9, 2020); *see* Statewide "Shelter in Place" Order Replaces Yuba-Sutter directive, https://yubanet.com/regional/statewide-shelter-in-place-order-replaces-yuba-sutter-directive/ (last visited Apr. 10, 2020); Mervosh, Lu, & Swales, *See Which States and Cities Have Told Residents to Stay at Home* (Apr. 7, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last visited Apr. 10, 2020).

[8] *In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mc-71055-TSH, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020).

COVID-19 spreads "easily and sustainably" from person to person, infected people can spread it (even if they are asymptomatic), and COVID-19 can survive on surfaces for days.[9] It spreads even faster when it is in confined spaces, such as cruise ships, aircraft carriers, and prisons.[10]

There is no approved vaccine to prevent infection.[11] Instead, to control the virus, the CDC (the Centers for Disease Control and Prevention) recommends that people stay at least six feet away from each other (a practice called "social distancing"), stay at home, wash their hands often, disinfect surfaces, and cover their mouths and nose with a cloth face cover when around others.[12]

"[J]ails and prisons present extraordinarily dangerous conditions for the spread of the virus." *United States v. Daniels*, No. 5:19-cr-00709-LHK (NC), Order – ECF No. 24 at 5–7 (N.D. Cal. Apr. 9, 2020) (citing articles and cases and taking judicial notice of information on the U.S. Bureau of Prisons' website).[13]

The CDC has determined that certain persons are more susceptible to being infected with COVID-19.[14] These include people who are 65 and older, people who live in a nursing home or other long-term care facility, people who are homeless, and people of all ages with underlying

---

[9] Ctrs. For Disease Control & Prevention, *How COVID-19 Spreads* (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Findex.html (last visited Apr. 10, 2020).

[10] *Ortuño v. Jennings*, No. 3:20-cv-02064-MMC, Order – ECF No. 28 at 3–4 (N.D. Cal. Apr. 8, 2020); *Daniels*, No. 5:19-cr-00709-LHK (NC) – ECF No. 24 at 4–5.

[11] Ctrs. For Disease Control & Prevention, *How to Protect Yourself & Others,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 10. 2020).

[12] Ctrs. For Disease Control & Prevention, *Social Distancing, Quarantine, and Isolation* (April 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Apr. 10, 2020); Ctrs. For Disease Control & Prevention, *How to Protect Yourself & Others* (April 8, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 10, 2020).

[13] *See also* Mot. – ECF No. 6-1 at 12–15 (describing the risks and collecting authorities on the point). This factual issue matters because the government argues that the risk is speculative (and that it is safer to be incarcerated), in support of an argument that the petitioner lacks standing. *See* Opp'n – ECF No. 16 at 18. The government's fact assertions are unsubstantiated, and the evidence is to the contrary.

[14] Ctrs. For Disease Control and Prevention, *Groups At Risk For Severe Illness* (April 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 10, 2020).

medical conditions, particularly if not well controlled, including the following: people with chronic lung disease or moderate to severe asthma, people who have hypertension or serious heart conditions, people with severe obesity (with a body-mass index of 40 or higher), people with diabetes, people with chronic kidney disease undergoing dialysis, people with liver disease, and people who are immunocompromised (including from cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune-weakening medications).[15]

## 2. The Petitioner

The petitioner is a citizen of Haiti who came to the United States in July 2005, when he was 16, after he witnessed Haitian police officers' beheading his parents.[16] In 2007, he became a lawful permanent resident based on an approved Special Immigrant Juvenile Status petition.[17] He initially lived in a foster home but ultimately moved to California, went to school, connected with many family members who live in the U.S. (including his cousins in East Oakland), and met (in 2009) and married (in 2012) his wife, a U.S. citizen.[18] They have lived together since 2010.[19]

The petitioner pleaded no contest in December 2011 to second-degree robbery, in violation of Cal. Penal Code § 211, with enhancements for bodily injury and use of a weapon, and was sentenced to three years for the robbery with a consecutive seven years for the enhancements.[20] (The weapon was a BB gun that the petitioner used to hit the person he robbed.[21]) He has no other

---

[15] *Id.*

[16] Pet. – ECF No. 1 at 6 (¶ 22); Petitioner's Decl., Ex. F. to Morales Decl. – ECF No. 1-2 at 23–24 (¶¶ 11–18); Lovedel Decl. – ECF No. 16-1 at 5 (¶ 12).

[17] Pet. – ECF No. 1 at 6 (¶ 22); Rabinovich Decl. – ECF No. 1-4 at 2 (¶ 3); Lovedel Decl. – ECF No. 16-1 at 5 (¶ 12).

[18] Pet. –ECF No. 1 at 6–7 (¶¶ 24–25); Petitioner's Decl., Ex. F. to Morales Decl. – ECF No. 1-2 at 24–26 (¶¶19–31); Wife's Decl., Ex. H to Morales Decl. – ECF No. 1-2 at 67 (¶ 2).

[19] Wife's Decl., Ex. H to Morales Decl. – ECF No. 1-2 at 67 (¶ 2).

[20] Pet. – ECF No. 1 at 7 (¶ 26); DHS Record, Ex. D to Morales Decl. – ECF No. 1-2 at 17–18.

[21] Petitioner's Decl., Ex. F. to Morales Decl. – ECF No. 1-2 at 27 (¶ 35).

ORDER – No. 20-cv-02141-LB                    4

criminal history.[22] He served eight years of his ten-year sentence (slightly less than the ordinary 85% because of good-time and educational-merit credits) and was released from Folsom State Prison on April 15, 2019.[23] His declaration in support of his application for adjustment of status describes his activities at Folsom, including obtaining his high-school diploma, vocational training in electronics, mental-health treatment, reconnecting to the spiritual practice (called Ifa) of his father, learning and then teaching guitar, performing with a band, and charitable work.[24] He apparently had no disciplinary violations at Folsom.[25] A psychological assessment of him includes a review of his prison records, confirms his mental-health diagnosis and his extensive (and successful) educational, therapeutic, and charitable activities.[26]

The petitioner has been in ICE custody since April 15, 2019 and has not had a bond hearing.[27]

A G4S security officer — a company that contracts with ICE — groped the petitioner on at least two separate legal visits in San Francisco between September and December 2019.[28] The petitioner and several other victims reported the assault to the San Francisco Police Department

---

[22] *See* Pet. – ECF No. 1 at 7 (¶¶ 26, 28); Rabinovich Decl. – ECF No. 1-4 at 2 (¶ 3); DHS Record, Ex. D to Morales Decl. – ECF No. 1-2 at 17–18.

[23] Rabinovich Decl. – ECF No. 1-4 at 2 (¶ 3).

[24] Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 28–32 (¶¶ 40–71). Ifa is a practice focused on building a "character of humility and compassion." *Id*. at 30 (¶ 56).

[25] *See id.* at 31 (¶ 69).

[26] In the psychological evaluation (credited by the IJ), the psychologist reviewed prison records reflecting the diagnosis of chronic PTSD, depression, anxiety, and symptoms that included sleeplessness and nightmares. Shidlo Decl., Ex. G to Morales Decl. – ECF No. 1-2 at 39 (¶¶ 14–22). The records show the petitioner's participation in therapy, religious programs, a band, and college and electronics courses. *Id.* (¶ 15). An annual review at Folsom notes that the petitioner did not engage in any cell violence or predatory behavior toward inmates or staff. *Id.* (¶ 16). The records reflect all of the petitioner's programming and describe him as a role model, a motivated student, disciplined, reliable, and hardworking, with the "right attitude for employment." *Id.* at 40–41 (¶¶ 17–22). The assessment synopsizes the petitioner's background and experiences (including the crime), describes the tests that the psychologist administered, confirms the diagnosis of PTSD and Depressive Disorder NOS, finds him credible, finds that he presented a low risk of violence, and opines that with good mental-health treatment, the petitioner is likely to function successfully, both socially and vocationally. *Id.* at 41–53 (¶¶ 23–63).

[27] Pet. – ECF No. 1 at 6 (¶ 21); Rabinovich Decl. – ECF No. 1-4 at 4 (¶ 8).

[28] Rabinovich Decl. – ECF No. 1-4 at 3 (¶ 7).

ORDER – No. 20-cv-02141-LB 5

("SFPD"), which investigated the assault.[29] SFPD Sergeant-Inspector Antonio Flores signed a Form I-918 Supplement, U Nonimmigration Status Certification, certifying him as a victim of the qualifying crimes of Abusive Sexual Contact and Sexual Assault, and reflecting the petitioner's cooperation and truthful information.[30] This allows the petitioner to file for a U visa.[31]

The petitioner has been diagnosed with chronic PTSD, depression, and latent tuberculosis.[32] He has nightmares, usually about his parents' death, and experiences fear, anxiety, tightness in his chest, and trouble sleeping.[33]

One article describes PTSD as — in addition to a chronic psychiatric illness — a "somatic condition, such that patients with PTSD have been found to have a biological alterations in several primary pathways involving the neuroendocrine and immune systems."[34] Mira Zein, M.D., M.P.H., who is a Clinical Assistant Professor at Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, describes how depression, stress, and PTSD affect the immune system.[35] "Growing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections."[36] These illnesses are "linked with elevated stress levels," which can impact immune responses.[37] "Depression, anxiety, and PTSD have all been found to directly stimulate production of pro-inflammatory cytokines, as well as downregulate cellular immunity leading to increased risk of

---

[29] *Id.*

[30] *Id.*; Supp. B, U Nonimmigrant Status Certification, Ex. C to Morales Decl. – ECF No. 1-3 at 50–53.

[31] Rabinovich Decl. – ECF No. 1-4 at 3 (¶ 7).

[32] Pet. – ECF No. 1 at 2 (¶ 1), 9 (¶ 33), 26 (¶ 75); Shidlo Decl., Ex. G to Morales Dec. – ECF No. 1-2 at 36 (¶ 2); *see also* Zein Decl., Ex. AA to Morales Supp. Decl. – ECF No. 19-1 at 7–9.

[33] Petitioner's Decl., Ex. F to Morales Decl. – ECF No. 1-2 at 28–29 (¶¶ 40–54).

[34] Neigh & Ali, *Co-Morbidity of PTSD and Immune System Dysfunction: Opportunities for Treatment*, Curr. Opin. Pharmacol. (Author Manuscript) (Aug. 1, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4992603/pdf/nihms805030.pdf

[35] Zein Decl., Ex. AA to Morales Third Decl. – ECF No. 19-1. M.P.H. is a Master's Degree in Public Health.

[36] *Id.* at 5.

[37] *Id.* at 7.

acute and prolonged infection, and delayed wound healing."[38] She concludes that weakened immunity due to mental-health disorders can put detainees "at increased risk of contracting and suffering from more severe forms of COVID-19."[39]

Carlos Franco-Paredes, M.D., M.P.H., D.T.M.H., who is an Associate Professor of Medicine at the University of Colorado Department of Medicine, Division of Infectious Diseases, describes COVID-19 risks at immigration detention centers.[40] "The physical and emotional trauma that detainees and asylum seekers experience can weaken their immune systems, resulting in increased risk of severe manifestations of infections."[41] Other countries have identified people with "severe psychiatric illness" as a group at "high risk of dying [from COVID-19] regardless of their age."[42]

The petitioner also suffers from latent tuberculosis.[43] Initially, he described his medical condition thusly: "it is unclear how the novel coronavirus will interact with" the petitioner's latent tuberculosis.[44] Subsequently, he submitted additional information.[45] Tuberculosis, like COVID-19, is a respiratory disease.[46] George Martinez, M.D., who conducted the petitioner's medical examination for his immigration proceedings, did not specify a definite relationship between latent tuberculosis and COVID-19, given that the virus is still new to healthcare professionals.[47] One observational study studied the relationship of tuberculosis and COVID-19 in 36 confirmed COVID-19 patients.[48] It found that "individuals with latent or active TB [Tuberculosis] may be

---

[38] *Id.*

[39] *Id.* at 9.

[40] Franco-Paredes Decl., Ex. S to Morales Decl. – ECF No. 1-3 at 78–90. D.T.M.H. is a diploma in tropical medicine and hygiene.

[41] *Id.* at 81.

[42] *Id.* at 82.

[43] Pet. – ECF No. 1 at 26 (¶ 75); Rabinovich Decl. – ECF No. 1-4 at 7 (¶ 24).

[44] Pet.– ECF No. 1 at 26 (¶ 75) (citing Rabinovitch Decl. – ECF No. 1-4 at 7 (¶ 24)).

[45] Mot. – ECF No. 26. Given the nature of the proceedings, and for the reasons described above, the court considers the additional submission.

[46] Chen Study, Ex. A to Rabinovich Decl. – ECF No. 26-1 at 12.

[47] Rabinovich Decl. – ECF No. 1-4 at 7 (¶ 24).

[48] Chen Study, Ex. A to Rabinovich Decl. – ECF No. 26-1 at 6, 9–10.

ORDER – No. 20-cv-02141-LB          7

more susceptible to SARS-CoV-2[49] infection."[50] It also found that "COVID-19 disease progression may be more rapid and severe" in those with latent or active tuberculosis.[51] It identified "tuberculosis history (both of active TB and latent TB) [as] an important risk factor for SARS-CoV-2 infection."[52] The study noted that its findings are limited because it is based on a low number of cases.[53]

If he is released, the petitioner has said that he will live with his wife in Oakland, California.[54] In her declarations, the petitioner's wife describes their close relationship, his relationship with her son and other children in the family, his creativity and support, his rehabilitation, and her need for his support given her health issues.[55] She identifies her two-bedroom apartment in Oakland as their residence, describes how they will be able to practice social distancing, and describes the substantial precautions she follows to ensure her health, such as washing her hands, wearing a mask and gloves outside, immediately washing her clothes when she returns to her home, cleaning frequently, and washing her hands frequently.[56]

Because the petitioner is on County parole, he will have access to robust mental-health, educational, job-training, and job-placement services.[57]

---

[49] SARS-COV-2 is the virus for COVID-19. World Health Org., *Naming the coronavirus (COVID-19) and the virus that causes it,* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Apr. 11, 2020).

[50] Chen Study, Ex. A to Rabinovich Decl. – ECF No. 26-1 at 11.

[51] *Id.*

[52] *Id.* at 5–6.

[53] *Id.* at 12. The study has not been peer-reviewed, given that it was posted on March 16, 2020.

[54] Rabinovich Decl. – ECF No. 1-4 at 8 (¶ 30).

[55] *See* Wife's Decl., Ex. H to Morales Decl. – ECF No. 1-2 at 67–71 (¶¶ 2–29); Wife's Decl., Ex. BB to Morales Third Decl. – ECF No. 19-1 at 19 (¶¶ 3–4).

[56] *See* Wife's Decl., Ex. BB to Morales Third Decl. – ECF No. 19-1 at 19 (¶¶ 2–5).

[57] Letter, Ex. CC to Morales Third Decl. – ECF No. 19-1 at 22–31. Alameda County is resource-rich for those on County supervision.

### 3. Immigration Proceedings

The petitioner's conviction is an aggravated felony, which means that he is removable under § 273(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A)(iii).[58] The petitioner advanced two claims for relief from removal: an adjustment of status (based on an approved spousal visa) and protection under the Convention Against Torture.[59] On February 13, 2020, the Immigration Judge ("IJ") denied the application for relief and ordered the petitioner removed to Haiti.[60] The IJ "observed the [petitioner's] demeanor and analyzed his testimony for consistency, specificity, and persuasiveness" and found his testimony "plausible, believable, candid, and generally consistent."[61] "After considering the totality of the evidence and weighing all the relevant factors," the IJ found the petitioner "credible and accord[ed] his testimony full evidentiary weight," and also found credible the testimony of the petitioner's wife and the examining psychologist (summarized above).[62]

On March 2, 2020, the petitioner timely appealed to the Board of Immigration Appeals.[63] There is no briefing schedule, and the timeline for a decision is anywhere from six months to over a year.[64]

As mentioned above, the petitioner has said that he will apply for a U visa.[65]

---

[58] Pet. – ECF No. 1 at 7 (¶ 28); Notice to Appear, Ex. A to Morales Decl. – ECF No. 1-2 at 6.

[59] Pet. – ECF No. 1 at 7–8 (¶ 29); *see also* IJ Order, Ex. L to Morales Decl. – ECF No. 1-3 at 32–42.

[60] IJ Order, Ex. M to Morales Decl. – ECF No 1-3 at 42.

[61] *Id.* at 34.

[62] *Id.* at 36 (summarizing the psychologist's diagnoses, the strong family relationships, and the petitioner's wife's need for support from her husband, given her own ailments, and also finding other witnesses credible).

[63] Pet. – ECF No. 1 at 8 (¶ 32); Notice of Appeal, Ex. M to Morales Decl. – ECF No 1-3 at 44.

[64] Rabinovich Decl. – ECF No. 1-4 at 3 (¶¶ 5–6).

[65] *Id.* (¶ 7).

### 4. The Conditions of Confinement at Yuba County Jail

The petitioner's housing unit is detained in "Pod C," a large open space in the basement, housing 50 people, and divided into an upstairs and a downstairs.[66] The detainees sleep downstairs, in an open room with beds about three to four feet apart.[67] The upstairs has a communal dining area, the commissary, and an exercise space.[68] There are phones and bathrooms upstairs and downstairs.[69] There are six sinks in the pod, and one has hot water for food preparation.[70] The sinks have push-button faucets that stay on for only a short time and require repeated pressing to complete a handwashing.[71] The detainees have three meals a day, served communally, at tables that seat six people, and some eat on their cots because there are not enough spaces in the dining room.[72]

Until March 19, 2020, according to the petitioner, no jail employee cleaned inside the pod, though detainees cleaned occasionally (possibly weekly) and had to ask a guard for cleaning supplies (kept in a locked closet).[73] Before March 19, 2020, detainees could obtain soap only by buying it at the commissary, and they could not buy hand sanitizer.[74] Starting on March 20, 2020, jail officials began distributing small bars of soap that disintegrate quickly, allow only a couple of hand washes, and did not always allow distribution to all detainees.[75] There are no masks for detainees, but some (not all) staff members have masks now.[76]

---

[66] *Id.* at 4 (¶¶ 10–12).

[67] *Id.* (¶ 12).

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 5 (¶ 13).

[73] *Id.* (¶ 14)).

[74] *Id.* (¶ 15).

[75] Rabinovich Decl. – ECF No. 19-2 at 2 (¶ 4).

[76] *Id.* at 2–3 (¶ 6).

ORDER – No. 20-cv-02141-LB        10

According to the government, the jail can house 210 detainees.[77] Since March 11, 2020 (the date that the World Health Organization declared COVID-19 a global pandemic), ICE's Enforcement and Removal Operations is "taking affirmative steps to reduce the number of detainees" at Yuba County Jail and has reduced the population (from 168 to 150) by 10 percent.[78] As of April 2, 2020, there are 150 detainees at Yuba, 140 male and 10 female.[79] The number of detainees can fluctuate based on book-ins and releases.[80] ICE is assessing detainees at intake, placing any detainees with COVID-19 symptoms in quarantine (and testing them), and thereafter providing appropriate treatment.[81] As of April 9, 2020, there are no suspected or confirmed cases of COVID-19 at Yuba.[82] The jail has "increased sanitation frequency and provides sanitation supplies including disinfectants, sanitizer, and soap in every housing unit," and the "administration is encouraging both staff and the general staff population to use these [hygiene] tools often and liberally."[83] It has suspended in-person visits and limited professional visits to noncontact visits.[84] It screens all staff and vendors for body temperature when they enter the facilities.[85] It provides education to staff and detainees on the importance of hand-washing and other hygiene measures.[86] It has "identified housing units for the quarantine of patients who are suspected of or test positive for COVID-19" (after the assessment and monitoring protocols that apply during intake).[87]

---

[77] Lovedel Decl. – ECF No. 16-1 at 4 (¶ 7).

[78] *Id.*

[79] *Id.*

[80] *Id.* The petitioner replies to this point by pointing to increased book-ins and a resulting increased population of detainees. Reply – ECF No. 19 at 6–7; Zukin Decl., Ex. H to Morales Decl. – ECF No. 19-1 at 118–120 (¶¶ 4–8).

[81] Moon Decl. – ECF No. 16-2 at 5–6 (¶¶ 8–10).

[82] *See* Moon Decl. – ECF No. 16-2 at 6 (¶ 12) ("As of March 26, 2020 there are zero suspected cases of COVID-19 in the Yuba County Jail and zero confirmed cases"); Lovedel Decl. – ECF No. 16-1 at 5 (¶ 11). The respondent said at the April 9, 2020 hearing that this remains the case.

[83] Moon Decl. – ECF No. 16-2 at 6 (¶ 14).

[84] *Id.* (¶ 15).

[85] *Id.* (¶ 16).

[86] *Id.* at 7 (¶ 18).

[87] *Id.* (¶ 19).

### 5. Procedural Background

In his § 2241 petition, the petitioner challenges the conditions of his confinement (based on his inability to address his medical vulnerabilities through CDC-recommended measures such as social distancing and using cleaning products) and claims that his continued detention violates (1) his substantive due-process right under the Fifth Amendment to the U.S. Constitution to be detained in a safe situation, free from punitive conditions of confinement, and (2) his procedural due-process right to a bond hearing under the Fifth Amendment.[88]

The court granted the petitioner's unopposed motion to proceed pseudonymously.[89] The court held a hearing on the TRO on April 9, 2020.[90]

## STANDARD OF REVIEW

A TRO preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary-injunction application. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). A TRO is an "extraordinary remedy" that the court should award only when a plaintiff makes a clear showing that it is entitled to such relief. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

The standards for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001). A movant must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. The irreparable injury must be both likely and immediate. *Id*. at 20–21. "[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

---

[88] *Id*. at 29–30 (¶¶ 83–90).

[89] Order – ECF No. 10; Statement of Non-Opposition – ECF No. 9.

[90] Mot. – ECF No. 6; Opp'n – ECF Nos. 16, 17; Reply – ECF No. 19; Minute Entry – ECF No. 23.

ORDER – No. 20-cv-02141-LB            12

Before *Winter*, the Ninth Circuit employed a "sliding scale" test that allowed a plaintiff to prove either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) [ ] serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999) (citation omitted). In this continuum, "the greater the relative hardship to [a movant], the less probability of success must be shown." *Id*. After *Winter*, the Ninth Circuit held that although the Supreme Court invalidated one aspect of the sliding scale approach,[91] the "serious questions" prong of the sliding scale survived if the plaintiff satisfied the other elements for preliminary relief. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, a preliminary injunction may be appropriate when a movant raises "serious questions going to the merits" of the case and the "balance of hardships tips sharply in the plaintiff's favor," provided that the other elements for relief also are satisfied. *Id*. at 1134–35.

**ANALYSIS**

The government argues that (1) the petitioner cannot challenge the conditions of his confinement in a § 2241 petition seeking immediate release, (2) the petitioner did not exhaust his administrative remedies, (3) the petitioner lacks standing because any injury is speculative, and (4) the petitioner does not establish his entitlement to a TRO.[92] These arguments are not persuasive.

First, the court can address the petitioner's challenges to the conditions of confinement in a § 2241 petition. *See, e.g.*, *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No. 38 at 4 (N.D. Cal. Apr. 8, 2020); *Bent v. Barr*, No. 4:19-cv-06123-DMR, 2020 WL 1812850, at *2–3 (N.D. Cal. Apr. 9, 2020) (collecting cases); *see Lopez-Marroquin v. Barr*, No. 18-72922, Order (9th Cir. Apr. 9, 2020) (construing immigration detainee's COVID-19-related request for release under the All Writs Act as a 28 U.S.C. § 2241 petition and remanding to district court for consideration).

---

[91] The Supreme Court in *Winter* rejected the Ninth Circuit's holding that "the 'possibility' of irreparable harm was sufficient, in some circumstances to justify a preliminary injunction." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Instead, the *Winter* Court held that "plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Id*. (emphasis in original).

[92] Opp'n – ECF No. 16 at 15–24.

Second, for habeas claims, exhaustion of administrative remedies is prudential, not jurisdictional. *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). A court "may require prudential exhaustion when: (1) agency expertise makes agency considerations necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Id*. (*citing Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007)). "Nonetheless, a court may waive the prudential exhaustion requirement if administrative remedies are inadequate or not efficacious, pursuant of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Id*. (citation and quotation omitted).

Waiver of the prudential exhaustion requirement is appropriate here. Courts have entertained similar COVID-19 claims under habeas jurisdiction without mentioning prudential exhaustion. *See Bent*, 2020 WL 1812850 at *5–6 (collecting cases addressing habeas challenges). Also, the petitioner's claim of entitlement to a bond hearing is based on the Fifth Amendment (as opposed to being grounded in a statutory entitlement), and thus exceeds the jurisdiction of the immigration courts and the BIA. *See Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KSx), Order – ECF No. 17 at 10 (C.D. Cal. April 1, 2020) (waiving prudential exhaustion in a case with similar facts about the conditions of confinement). In addition, the petitioner suffers continued harm from the lack of a bond hearing, and given his health issues, irreparable injury results from his continued detention. *See Jimenez v. Wolf*, No. 5:19-cv-07996-NC, Order – ECF No. 25 at 3–4 (N.D. Cal. Mar. 6, 2020) (waiving the prudential-exhaustion requirement for similar reasons).

Third, the petitioner has standing. The risk of injury is not speculative. The petitioner submitted uncontested statements from public-health experts about the risks in jails, prisons, and detention centers. The risks are serious, even without a confirmed case of the virus in this detention center. *See Bent*, 2020 WL 1812850 at *3–4. The weight of authority supports the conclusion that detainees have standing. *See, e.g.*, *id.* at *3 ("[g]iven the exponential spread of the virus, the ability of COVID-19 to spread through asymptomatic individuals[,] . . . effective relief for [petitioner] and other detainees may not be possible if they are forced to wait until their

particular facility records a confirmed case") (collecting cases); *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 3 (where petitioners have not contracted COVID-19, standing is still met because of how rapidly the disease can spread in a confined space); *see also Castillo v. Barr*, No. 5:20-cv-00605-TJH (AFMx), 2020 WL 1502864, at *4–5 (C.D. Cal. Mar. 27, 2020) (standing based on similar facts); *see also Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877 (9th Cir. Mar. 24, 2020) (sua sponte ordering the petitioner released (and his removal stayed) pending final disposition by the court "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers."

\* \* \*

Fourth, as discussed in the next sections, the petitioner has satisfied the four TRO factors: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of equities tips in favor of the petitioner, and (4) an injunction is in the public interest.

**1. Likelihood of Success on the Merits**

The petitioner has two claims: (1) a substantive due-process claim under the Fifth Amendment that his conditions of confinement — in light of his heightened risk to COVID-19 — amount to punishment, and (2) a procedural due-process claim under the Fifth Amendment because he has been in ICE custody for a year and has not had a bond hearing.[93]

**1.1 Substantive Due-Process Claim**

The petitioner has at least raised a serious question that his continued detention poses risks that exceed the government's needs to ensure his presence at immigration proceedings, in violation of his substantive due-process rights under the Fifth Amendment.

Because the petitioner is a civil detainee, his confinement is unconstitutional under the Fifth Amendment if his conditions of confinement "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Jonas v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 535); *accord Bent*, 2020 WL 1812850 at *4; *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No.

---

[93] Pet. – ECF No. 1 at 29–30 (¶¶ 83–90).

ORDER – No. 20-cv-02141-LB    15

38 at 4; *Castillo*, 2020 WL 1502864 at *3. "[P]unitive conditions may be shown (1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, . . . or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jonas*, 393 F.3d at 932 (citations and quotation marks omitted). The government's legitimate, non-punitive interests include ensuring a detainee's presence at immigration proceedings. *See id.* (ensuring a detainee's presence at trial); *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No. 38 at 4 (immigration proceedings).

The issue here is whether, in light of the petitioner's health, his detention is excessive in relation to the government's interest in securing his presence at immigration proceedings. The evidence is undisputed that those with respiratory ailments are more susceptible to being infected by COVID-19, and the petitioner's other diagnoses of chronic PTSD and depression compound his susceptibility. His risk is heightened because detainees at Yuba County jail live in close quarters, cannot practice social distancing, do not have masks, and do not have access to adequate disinfecting and cleaning supplies.

Courts have found that similar conditions of confinement do not meet the constitutional standard for at-risk civil detainees. *See, e.g.*, *Ortuño*, No. 3:20-cv-02064-MMC, Order – ECF No. 38 at 6–7 (petitioners with diabetes and asthma; detainees are in close quarters, do not have masks, and cannot meaningfully practice social distancing); *Bent*, 2020 WL 1812850 at *2, 5–6 (petitioner with asthma, hypertension, and pre-diabetes; inadequate soap, sanitizer, and cleaning supplies; resulting inability — despite efforts to encourage social distancing — to implement the CDC's social-distancing guidelines; "public health experts make clear that an outbreak in confined spaces is potentially devastating") (collecting cases); *Castillo*, 2020 WL 1502864, at *5 (detainees cannot maintain a six-foot distance and were "put into a situation where they are forced to touch surfaces touched by other detainees, such as with common sinks, toilets, and showers;" noted the risks of infection in immigration facilities, given the rotation of facility guards and staff); *Hernandez*, No. 5:20-cv-00617-TJH (KSx), Order – ECF No. 17 at 1, 5–6, 13 (petitioner with hypertension and multiple medical ailments; similar conditions of confinement); *Basank v.*

*Decker*, 20-cv-2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26 2020) (inability to maintain social distancing to protect high-risk detainees shows a likelihood of success on the merits).

In sum, the petitioner has at least shown a serious question that his continued detention exceeds the government's legitimate interest in assuring his appearance in immigration proceedings. (The court addresses flight risk and danger to the community in section 2, below.)

**1.2 Procedural Due-Process Claim**

Because he has not had a bond hearing (despite a year in ICE custody), the petitioner has shown that he is likely to succeed on the merits of his procedural due-process claim.

A person who (like the petitioner) commits an aggravated felony may be detained in immigration proceedings, and the statutory scheme does not provide for a bond hearing or limit the length of detention. *See* 8 U.S.C. §§ 1226(a), (c); *Jennings v. Rodriguez*, 138 S. Ct. 830, 844, 846 (2018) ("§ 1226(c) does not on its face limit the length of the detention it authorizes."); *Jimenez v. Wolf*, No. 5:19-cv-7996-NC, 2020 WL 510347, at *2 (N.D. Cal. Jan. 30, 2020). Still, the Fifth Amendment "entitles aliens to the due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003). When confinement continues past a year, courts are wary of continued custody absent a bond hearing. *Gonzalez v. Bonnar*, No. 3:18-cv-05321-JSC, 2019 WL 330906, at *3 (N.D. Cal. Jan. 26, 2019) (collecting cases). Courts apply the three-factor balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to evaluate the constitutionality of the detention. *See, e.g.*, *Jimenez*, 2020 WL 510347 at *3 The three factors are (1) the private interest affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of any additional procedural safeguards, and (3) the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews*, 424 U.S. at 334–35.

First, there is no briefing schedule for the BIA appeal, and the uncontested timeline is anywhere from another six months to over a year. Given the petitioner's detention for almost a year to date, and the likelihood of six months to a year in the future, the length of detention

supports the conclusion that the petitioner's private interest militates in favor of his claim that the denial of a bond hearing violates his procedural due-process rights under the Fifth Amendment. *Gonzalez*, 2019 WL 330906, at *5; *Jimenez*, 2020 WL 510347 at *3.

Second, the other factors weigh in the petitioner's favor. The probable value of a hearing (given the lack of any bond hearing) is high. And while there is an important government interest in securing the petitioner's presence at any removal, the procedural due-process inquiry is about holding a bond hearing to assess whether the alien represents a flight risk or a danger to the community. *Jimenez*, 2020 WL 510347 at *3.

### 2. Remaining TRO Elements

The first element is irreparable harm. Continued detention and exposure to health-threatening conditions establish this element. *Sessions*, 872 F.3d at 994 (unconstitutional detention is irreparable harm); *Bent*, 2020 WL 1812850 at *6 (health issues establish irreparable harm to the petitioner's health and safety); *Ortuño*, No. 3:20-02064-MMC, Order – ECF No. 38 at 8 (same).

The second and third elements — the balance of equities and whether an injunction is in the public interest — merge. *Bent*, 2020 WL 1812850 at *7. The public's interests are containing COVID-19, securing the petitioner's appearance in his immigration proceedings, and preventing any danger to the community. *Id.*; *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 8. Under the circumstances here, the balance of equities and the public interest weigh in favor of release.

The petitioner cannot meaningfully protect himself at Yuba County jail from the risks of his custody. *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 8; *Bent*, 2020 WL 1812850 at *7. Injunctive relief that prevents the further spreading of the virus and allows social distancing is in the public's interest. *Ortuño*, No. 3:20-cv-02064-MMC, ECF No. 38 at 8 ("the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers"); *Bent*, 2020 WL 1812850 at *7 (collecting cases); *Castillo*, 2020 WL 1502864 at *6 ("[t]he public has a critical interest in preventing the further spread of the

coronavirus").[94] By living with his wife, the petitioner will be able to protect himself and others through social distancing and the other hygienic measures that the CDC recommends.

As to the risk of flight and danger to the community, the global pandemic is changing behavior and the way courts assess risk of flight and community safety. *See Bent*, 2020 WL 1812850 at *7 (collecting cases). The petitioner has substantial ties to the community and every incentive to comply with the conditions of his supervision, given the alternative of custody and the attendant dangers to his health there. He has a parole officer and considerable community resources, as discussed above, which means he has the supervision necessary to secure his appearance at immigration proceedings and ensure the safety of the community. His underlying crime is serious. But the record of his confinement shows his substantial rehabilitation. The IJ also found the petitioner to be plausible, believable, candid, and consistent, and the psychological evaluation of the petitioner confirmed his good behavior, his low risk of violence, and the likelihood that he will function successfully, both socially and vocationally.[95] Also, the court's conditions of release address any concern about flight risk and safety of the community.

In sum, given the petitioner's combination of medical issues (chronic PTSD, depression, and latent tuberculosis), the COVID-19 pandemic, the conditions of confinement at Yuba County jail, the irreparable harm to the petitioner, the balance of equities, and the public interest, the court grants the TRO and, as relief, orders the petitioner's release.

## CONCLUSION

The court grants the petitioner's motion for a TRO and orders his immediate release from custody.

The petitioner must reside with his wife in Oakland (at the address that she provided in her declaration), and he must shelter in place unless otherwise directed by his parole officer. What that

---

[94] Social distancing and sheltering in pace are the means to prevent the spread of the virus and not overwhelm the health-care system. Siobhan Roberts, *Flattening the Coronavirus Curve* (Mar. 27, 2020), https://www.nytimes.com/article/flatten-curve-coronavirus.html.

[95] IJ Order, Ex. M to Morales Decl. – ECF No. 1-3 at 34; Shidlo Decl., Ex. G to Morales Decl. – ECF No. 102 at 39–53 (¶¶ 14–63).

ORDER – No. 20-cv-02141-LB         19

means is that pending further order of the court or the permission of his parole officer, the petitioner may leave home only to obtain medical care, meet with his parole officer (as directed), meet with his attorneys, appear at any immigration proceedings, or to obey any order issued by the immigration authorities. While on release, he must not violate any federal, state, or local law. The petitioner's parole officer may impose additional conditions or modify these conditions — when it is appropriate to do so — to allow the petitioner to engage in gainful activity. His attorneys must file any modified conditions on the docket.

Within two business days, the parties must confer about and submit a proposed schedule for the court's issuing a preliminary injunction. Ordinarily, that would require the government to show cause why the court should not issue a preliminary injunction, and the petitioner to thereafter file a response, and the government to file a reply.

**IT IS SO ORDERED.**

Dated: April 12, 2020

_____

LAUREL BEELER
United States Magistrate Judge